IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF PAUL HEENAN, by
Personal Representative John Heenan,

                              Plaintiff,                           OPINION AND ORDER

       v.                                                          13-cv-606-wmc

THE CITY OF MADISON and MADISON
POLICE OFFICER STEVEN HEIMSNESS,
In his individual capacity,

                              Defendants.

       In the early morning hours of November 9, 2012, in a bohemian, residential neighborhood on the near east side of the Capitol in Madison, Wisconsin, affectionately known as "Willy Street," defendant police officer Steven Heimsness tragically shot Paul Heenan, who had been mistaken for a burglar after he drunkenly attempted to enter a neighbor's home rather than his own. Because Heenan was unarmed, a criminal investigation was conducted, but no charges were filed against Heimsness. Following that decision, the Estate of Paul Heenan filed this federal lawsuit, alleging that Heimsness used excessive force in violation of Heenan's rights under the Fourth Amendment of the United States Constitution. Plaintiff also asserts a claim against the City of Madison for constitutionally defective policies and procedures that allegedly led to the tragic shooting. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).

       Now before the court are motions for summary judgment by both defendants. (Dkt. ##44, 49.) Because plaintiff has raised genuine issues of material facts with respect to both claims, the court will deny defendants' motions in their entirety. Also

before the court is defendants' joint motion to bifurcate the liability phase of trial to address first whether Heimsness violated Heenan's Fourth Amendment rights and then whether the City should be liable for any constitutional violation under *Monell*. (Dkt. #91.) Because the court agrees that the likely prejudice to Heimsness in having a jury consider both claims in the same phase warrants bifurcation of the liability issues, the court will grant that motion.[1]

## UNDISPUTED FACTS[2]

The basic facts relevant to deciding both defendants' motions for summary judgment are set forth first and primarily concern the events surrounding the shooting. Additional facts relevant to deciding plaintiff's municipal liability claim against the City of Madison are set forth in the opinion on the *Monell* claim. Except as noted, these facts are undisputed, at least for purposes of summary judgment.

### A. Background

At the time of the shooting, Officer Steven Heimsness was a City of Madison Police Officer, working nights for the Madison Police Department ("MPD"). Heimsness was hired by the City on September 8, 1997, had worked for the MPD Central District for 12 years and had been on regular patrol in the Willy Street neighborhood for three

---

[1] The court will also briefly address the City's related stipulation to entry of judgment against it, should the jury find in favor of the Estate on its claim against Heimsness.

[2] Unless otherwise noted, the following facts are undisputed. The court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

years before the shooting.  During the summer of 2012, Heimsness knew there had been armed robberies and burglaries from working in that area, from alerts sent to officers from MPD, and from speaking with day-shift officers who patrolled the same area.[3] Because drunken people coming out of the bars at night were easy targets for robberies, Heimsness particularly tried to patrol the area at bar time.  Heimsness was also aware that there was a lot of foot traffic in the area he patrolled, and that it was very dark in this area around bar time.

At 10:45 p.m. on November 8, 2012, Officer Heimsness started his normal shift wearing MPD's full military-style uniform, including a radio earpiece.  Heimsness also was wearing his duty belt, which held two loaded magazines of bullets, a Taser, a baton, a second cartridge for the Taser, a portable radio, a multi-tool, an AR 15 magazine, gloves, a set of keys, a gun holster containing a 9 mm Glock model 17 pistol, OC (oleoresin capsicum) spray (more commonly known as pepper spray), and double handcuffs.[4]  At approximately 12:27 a.m., Heimsness sent a Mobile Data Computer ("MDC") message

---

[3] Plaintiff represents that for the ten months leading up to the shooting, there had been 76 breaking and entering type calls to the MPD in or near the east side of Madison, although only one call involved a weapon, a kitchen knife involved in a domestic disturbance call.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 5 (citing Declaration of Andrea J. Farrell ("Farrell Decl."), Ex. X (dkt. #64-24)).)  In reply, the City points out that there is no evidence that Heimsness was aware of any of the details of these other calls.  (City's Reply to PFOFs (dkt. #78) ¶ 5.)

[4] The baton weighs nine pounds, which MPD officers are taught in training to use to strike a threat, if necessary.  They are specifically trained to strike points on the upper arm or the leg just above the knee, which are not considered lethal.  The flashlight also is an effective tool for striking.

to another Madison Police Officer: "I'm the right cop for the wrong job," "no witnesses, no problem." (Am. Compl. (dkt. #20) § 4125; Answ. (dkt. #22) ¶ 4125.)[5]

During the early morning hours of November 9, Heimsness was dispatched to a noise complaint at 606 S. Brearly Street in Madison. Once at the scene, Heimsness heard dispatch relay information at approximately 2:47 a.m. of a possible breaking and entering (described by dispatch as a "B&E") at 513 S. Baldwin Street. In response, Heimsness notified dispatch that the noise complaint was unfounded, and that he was en route to the Baldwin Street burglary call. Officer Heenan heard a number of other officers report to dispatch that they would be responding to the breaking and entering call as well.

---

[5] MDC messages allow officers to chat via text from squad car computer to squad car computer so that the only person who sees the communication at the time are the officers in the sending car and the officers in the receiving car. Defendants object to the consideration of this and other MDC messages described below in Opinion § IV.B.ii.c on the basis that they are inadmissible, "other acts" or "improper character" evidence under Fed. R. Evid. 406 and 608, respectively. While the court agrees that some of these messages may not be sufficiently relevant to the claims directed against Heimsness, the messages are relevant to plaintiff's claim against the City for lack of supervision. Moreover, to the extent that these messages -- particularly the message above, which Heimsness sent a little more than two hours before the shooting -- could be used to challenge Heimsness's credibility regarding his account of the circumstances surrounding the shooting, the messages may be properly considered by the jury under Rules 406 and 508 during the first phase of the trial. *See Graham v. Connor*, 490 U.S. 386, 399 n.12 (1989) ("Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen."). Because they are tangential to the court's decision on summary judgment, however, a decision on the admissibility of the MDC messages in the first phase of the trial can await another day.

### B. Officer Heimsness Arrives at Scene

At 2:48:43 a.m., dispatch informed Heimsness that a female occupant of the house where the breaking and entering was in progress reported hearing something at the front door of the house, that someone had come to the front door, that her husband had gone downstairs to see what was happening, and that the female occupant remained upstairs in the house with her four children. Based on this information while travelling to Baldwin Street, Heimsness understood he was being dispatched to a felony in progress, that it was a high risk incident, that he may be confronting a suspect who did not want to get caught, that confronting a suspect can be dangerous, and that the suspect could have a weapon or be armed.[6]

Heimsness proceeded to 513 S. Baldwin Street at the cautious rate of approximately 30 miles per hour, which is at or below the speed limit, and did not turn on his squad lights or sirens so as not to notify the suspect that police were responding. When Heimsness arrived at the intersection of Baldwin Street and Spaight Street, he also

---

[6] Plaintiff challenges whether the dispatch could reasonably be described by a trained officer as a felony in progress in light of the dispatcher's use of "breaking and entering," which is a misdemeanor, as compared to burglary, which is a felony. *Compare* Wis. Stat. § 943.14, *with* Wis. Stat. § 943.10(1m). Certainly, the severity of the reported crime is relevant to considering the objective reasonableness of Heimsness's actions, but that determination does not turn on a simple label. While dispatch described the call as a "B&E," how an objective officer would reasonably treat such a call is for a jury to determine. In addition, Heimsness submits expert testimony opining that night time burglaries are more dangerous than day time burglaries and that "almost all night time home invaders are armed." (Heimsness's PFOFs (dkt. #50) ¶¶ 40, 42 (citing Affidavit of Ron Martinelli ("Martinelli Aff."), Ex. A (dkt. #53-1) p.20, ¶¶ 1.20.1, 1.20.2).) At most, this opinion evidence -- and other expert testimony offered by both parties -- bolsters or undermines their arguments that Heimsness's actions were or were not objectively reasonable, but are not dispositive at summary judgment.

turned off his car's headlights so that any suspects who might have been acting as lookouts or accomplices would not know that the police had arrived.  Officer Heimsness then parked his squad car on Baldwin Street at the southwest corner of the intersection of Baldwin and Spaight, approximately 150 feet from the driveway of 513 S. Baldwin.

As depicted below, the relevant block of Baldwin runs between Jenifer Street on the north (left-hand side of the page) and Spaight Street on the south (right hand side of the page).  The house located at 513 S. Baldwin Street is on the east side of the street (depicted at the top of the image, approximately at the midpoint of the image).



(Declaration of Andrea J. Farrell ("Farrell Decl."), Ex. I (dkt. #64-9).)  Heimsness crossed Baldwin at an angle and walked toward 513 S. Baldwin Street.  While approaching, dispatch relayed at approximately 2:49:33 a.m. that the husband/homeowner was wearing a light-colored shirt and plaid pajama pants.  There were trees and street lights along Baldwin Street, and Heimsness attempted to stay somewhat concealed as he approached.

Around this same time, Heimsness saw another MPD squad car on Baldwin Street, approaching the Jenifer Street intersection with its lights off.  Although

Heimsness did not know that the squad car was being driven by Officer Stacy Troumbly, he knew the car was responding to the same call and contained at least one police officer who was armed, trained and could offer assistance.  Because Heimsness wanted the other officer or officers in that car to know where he was, he turned on his flashlight and "blipped" the squad car a couple of times before turning off his flashlight and returning it to its holder.[7]  Then Chief of Police, Noble Wray, testified at his deposition that officers are trained to wait for back up whenever possible in responding to calls like a potential breaking and entering.  Officers also wear a radio to facilitate communication with dispatchers and other officers.

### C.  Physical Encounter Between Heenan and O'Malley

As Heimsness continued to approach S. Baldwin, he was able to see the address number 513.  He also noticed that the porch light was on and the screen door was closed, but that the interior door was open.  After crossing the street, Heimsness stopped on the terrace and waited -- albeit from the record it appears very briefly -- for more officers.  At that moment, Heimsness represents that a tree was still blocking his view of what was occurring on the sidewalk between the house and him.[8]  Heimsness then stepped onto the sidewalk, at which point he saw movement approximately 60 feet away to his left toward Jenifer Street and observed what he described as two males -- later identified as

---

[7] Plaintiff also points to statements in the record that Heimsness "blipped" his flashlight so that backup would then come to that part of the street.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 22; Pl.'s PFOFs (dkt. #72) ¶ 51.)

[8] Though its relevance is dubious, plaintiff notes that there were actually three large trees in the terrace available for cover.

the homeowner, Kevin O'Malley, and the deceased, Paul Heenan -- "struggling" with each other.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 33.)

The parties dispute the proper characterization of this physical exchange, but it appears undisputed that there was some physical contact between Heenan and O'Malley. Whether it was pushing and shoving as defendants' characterize or simply grabbing as O'Malley testified, Heimsness admits that he did not see either man throwing punches or kicking.  Neither did he see any weapons in either man's hands, although he obviously did not know if Heenan had any concealed weapons.  He also could see that the two men were also of comparable size.[9]

At 2:49:39 a.m., Heimsness alerted dispatch that there was a "fight" between the homeowner and the suspect.  Troumbly also heard Heimsness alert dispatch of the fight over the radio as she proceeded from her squad car on foot crossing Jenifer Street to Baldwin Street.  At 2:49:45 a.m., Troumbly relayed over her radio that she was on the scene.  Plaintiff represents that she was approximately three houses or 150 feet away from 513 S. Baldwin.

Tragically and unbeknownst to Heimsness, what he apparently thought was occurring and what was actually occurring were two entirely different things.  O'Malley explained at his deposition that he was actually attempting to situate his neighbor Paul Heenan and to lead him back to his own home, which was just two doors away. Specifically, when O'Malley encountered Heenan, who was plainly intoxicated, he had

---

[9]  Heenan was approximately 5' 11" tall and weighed approximately 150 pounds. O'Malley is 5' 9" tall and also weighed approximately 150 pounds.

asked Heenan if he had been out at the bar and told Heenan that he had attempted to enter the O'Malleys' home rather than his own. Heenan then said something to the effect of, "you want to get weird," and leaned his head toward O'Malley. (Pl.'s Resp. to Heimsness's PFOFs (dkt. #62) ¶ 13 (citing Deposition of Kevin J. O'Malley ("O'Malley Depo.") (dkt. #40) 81-82).) At that point, O'Malley grabbed Heenan's lapel in an attempt to create some distance between himself and Heenan, and Heenan responded by grabbing O'Malley's arms hard enough to sustain a "slight mark" on his left arm. (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 35 (citing O'Malley Depo. (dkt. #40) 114).) O'Malley then attempted to move Heenan and himself toward O'Malleys' home so that he could get help from his wife. While on the sidewalk, O'Malley first noticed a police officer, later identified as Officer Heimsness.

### D. Officer Heimsness Confronts Heenan

Heimsness had surmised at about that same time that the man with the light-colored shirt and pajama pants was the homeowner, consistent with the information received from dispatch, and that the other man, who was wearing jeans, a navy jacket and a striped scarf, was the suspect. Heimsness also represents that while he could hear the two men saying things to each other, he could not hear exactly what they were saying. Plaintiff contends that the only person talking was O'Malley, who may have been saying something in an effort to alert Heenan to his surroundings. While plaintiff also contends that it was "readily apparent to a layperson that Mr. Heenan was extremely intoxicated" (Pl.'s PFOFs (dkt. #72) ¶ 42 (citing Declaration of Kevin O'Malley ("O'Malley Decl.") (dkt. #65) ¶¶ 7, 11)), Heimsness disputes this, testifying at his deposition that Heenan

did not appear intoxicated to him (Heimsness's Resp. to Pl.'s PFOFs (dkt. #83) ¶ 42 (citing Deposition of Steven Heimsness ("Heimsness Depo.") (dkt. #23) 162)).[10]

There is no dispute that Heimsness silently approached the two men to within approximately 25 feet, then drew his gun, pointed it at the two men and yelled something like "get on the ground now" or "get down, get down." (City's PFOFs (dkt. #45) ¶ 41.) Heimsness avers that he drew his gun because he needed to confront a suspect who was in a physical struggle with a victim. Heimsness also contends that he yelled the command to get down "repeatedly." (Affidavit of Steven Heimsness ("Heimsness Aff.") (dkt. #52) ¶ 48.) O'Malley states that he remembers Heimsness only yelling "get down, get down" once, but acknowledges that Heimsness may have repeated that command while O'Malley was yelling "he's a neighbor." (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 41 (citing O'Malley Decl. (dkt. #65) ¶ 57; City's Reply to PFOFs (dkt. #78) ¶ 41 (citing O'Malley Depo. (dkt. #40) 97-98).) Officer Troumbly testified at her deposition that Heimsness's order was "repeated." (City's Reply to PFOFs (dkt. #78) ¶ 41 (citing Deposition of Stacy Troumbly ("Troumbly Depo.") (dkt. #29) 122).)

After shouting an order and with the gun pointed at them, both of the men looked at Heimsness. While Heimsness never identified himself as a police officer, O'Malley understood by this point that Heimsness was an officer. Accordingly, O'Malley let go of

---

[10] Toxicology specimens collected at approximately 10:00 a.m. on November 9, 2012, reveal that Heenan had a blood alcohol level of approximately 0.218% and a urine alcohol concentration of 0.309%. As a point of comparison, under Wisconsin law, a blood alcohol level of 0.08% qualifies as operating while intoxicated. Wis. Stat. § 346.63. Of course, this evidence was not known to Heimsness at the time of Heenan's shooting, but may be relevant to support plaintiff's claim that a reasonably objective officer would have seen signs that Heenan was intoxicated at those levels.

Heenan, put his hands up and moved out of the way, off of the sidewalk onto the terrace, while still remaining within 10 to 15 feet of Heimsness.

Heenan then turned toward Officer Heimsness, who was approximately 10 to 25 feet away.  Heimsness continued to point his gun at Heenan with his right hand and also used his left hand to point at him, all while, he contends, continuing to give loud orders to get on the ground.  Heimsness represents that Heenan then quickly walked toward him, and said, "no, fuck you goddammit, no, fuck you goddammit."  (City's PFOFs (dkt. #45) ¶ 48 (citing Heimsness Aff. (dkt. #52) ¶ 54).)  O'Malley states that he only heard Heenan say, "Oh, now you?"  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 48 (citing O'Malley Depo. (dkt. #40) 95).)[11]

Regardless, there appears no dispute that Heenan approached Heimsness, but plaintiff contends -- relying again on O'Malley's account -- that he did so at a slow pace with his arms flailing.  There is also no dispute that Heimsness could see (1) Heenan's hands while he was approaching and (2) there was nothing in his hands.  (Farrell Decl., Ex. D (dkt. #64-4) 8; *see also* Am. Compl. (dkt. #20) ¶ 4215; Heimsness's Answ. (dkt. #22) ¶ 4215.)  Despite seeing no weapon in Heenan's hands, Officer Heimsness did not re-holster his gun or transition to another weapon.[12]

---

[11] Officer Troumbly's exact location at this moment is uncertain but she testified at her deposition that she did not hear Heenan say anything.  (Troumbly Depo. (dkt. #29) 123).)

[12] Plaintiff maintains that Heimsness was trained to transition to a non-deadly weapon if an unarmed man is coming towards him, but cites no legal authority supporting that he had such an obligation under the Fourth Amendment.

### E. Physical Encounter Between Heenan and Heimsness

As Officer Troumbly approached, she heard Heimsness say something to the effect of "Stop, get back, get back, get down, stop, now." (City's PFOFs (dkt. #45) ¶ 79 (citing Troumbly Depo. (dkt. #29) 124-125).) Troumbly testified at her deposition that Heimsness sounded scared and distressed, but also like he sounds when he is angry. She then saw Heimsness and Heenan become physically engaged, and began sprinting toward them.

During this time, O'Malley states that he was on the terrace yelling as loudly as he could, "he's my neighbor." O'Malley claims he continued yelling while he was moving into the driveway in Heimsness's line of sight, hoping that Heimsness would be attuned to what O'Malley was trying to communicate to him. (Pl.'s PFOFs (dkt. #72) ¶ 96.)

What follows is largely disputed. As Heenan approached, Heimsness avers that he began to back up in an attempt to distance himself from Heenan. Plaintiff disputes this, relying on O'Malley's view that Heimsness and Heenan were both moving toward each other, as Officer Troumbly approached. (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 50.)

Heimsness also contends that he pulled his right hand holding the gun back towards his right shoulder in an effort to keep it away from Heenan, but that Heenan reached for his right hand. Plaintiff contends that this account is not credible given the limited amount of time Heenan would have had to reach for his gun and the fact that Heimsness failed to convey this information to Troumbly, although it is undisputed that he told others after the shooting that Heenan had grabbed for his gun.

Heimsness further contends that he attempted to push Heenan away, but that Heenan with his right hand grabbed Heimsness's left hand and squeezed it to the point where Heimsness felt pain in his left pinky finger for several hours after the encounter. Plaintiff disputes this as well, largely relying on O'Malley's testimony that Heenan "sort of swat[ted] at the back of the police officer," without any mention that Heenan grabbed Heimsness's hand.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 54 (citing O'Malley Depo. (dkt. #40) 101, 109).)[13]

Heimsness contends that he continued to try to push Heenan away and was stepping back while doing so.  Once again, plaintiff challenges this account, contending instead that Heimsness was moving toward Heenan, in part because of the fact that the two men advanced north, toward Jenifer Street from 513 S. Baldwin to 511 S. Baldwin. From Troumbly's perspective, she could see the back of Heenan's head and Heimsness was facing her, but with Heenan always between Heimsness and Troumbly.   Troumbly had pulled her Taser and was prepared to deploy it toward Heenan's back.

While this physical exchange was occurring, Heimsness further avers that he did not want to turn and run, having been trained not to turn his back on a suspect.  He also claims to have been unsure of how much room he had to back up, worrying that he might

---

[13] Plaintiff would make much of the fact that Heimsness did not immediately report the pain in his finger, though it is undisputed that he mentioned the pain while he was still on the scene to Sergeant Krahn.  Moreover, it appears undisputed -- or at least consistent with O'Malley's account -- that Heenan came into contact with Heimsness's left hand.

trip over a curb or other object.[14]  At the same time, Officer Heimsness contends that Heenan's right hand continued to have a hold of Heimsness's left hand, and that Heenan was using his left hand to swat and grab at Heimsness's gun.  Heimsness further contends that Heenan's eyes were locked on his gun.

Although Heimsness acknowledges that he did not know if Heenan ever touched his gun (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 117 (citing Heimsness Depo. (dkt. #23) 69)), Heimsness at this point represents that he became worried Heenan was trying to disarm him and, if successful, might shoot him, or at least disable his gun.  Regardless, there is no dispute that Heimsness then gave Heenan a weak push or shove with his left hand, moved him back at least a few feet, got a strong two-handed grip on his gun, and shot Heenan three times in rapid succession.[15]

The shots were fired at 2:49:54 a.m., just fifteen seconds after Heimsness alerted dispatch of the struggle between Heenan and O'Malley and nine seconds after Troumbly had alerted dispatch (and in turn Heimsness) that she was on the scene.  There is no dispute that the physical encounter between Heimsness and Heenan lasted a matter of seconds.

---

[14]  Defendant Heimsness also offers expert testimony on the risks of falling or being brought to the ground when an officer engages with a suspect.  (Heimsness's PFOFs (dkt. #50) ¶¶ 97-99 (citing Martinelli Aff., Ex. A (dkt. #53-1) p.19, ¶ 1.17).)

[15]  While Troumbly did not see the push, she saw Heenan's upper body moving backwards, and from that, she believed that Heimsness had pushed Heenan backwards.

14

At 2:49:58 a.m., Heimsness called dispatch to report, "David 8, shots fired, suspect down, we are 10-2." (Pl.'s PFOFs (dkt. #72) ¶ 134.) "10-2" means "we're okay." (*Id.* at ¶ 135.)

### F.  Aftermath of Shooting

Immediately after the shooting, supervisor Sergeant Krahn responded to the scene. Heimsness noticed Krahn and told him, "He came at me and I shot to get him off of me." (Pl.'s PFOFs (dkt. #81) ¶ 148.)  Krahn requested a channel for emergency rescue efforts for Heenan, but Heimsness responded that a channel was not needed because "he's dead." (*Id.* at ¶ 152.)  Heimsness reported being really mad after the shooting because "the guy made me shoot him.  I was pissed off at the guy that he made me shoot him." (*Id.* at ¶ 155.)  Plaintiff also points to testimony of Chief Wray that Heimsness did not display typical symptoms an officer may feel following a high-stress event -- though Wray did testify that he witnessed Heimsness pacing at one point.  Instead, Heimsness appeared very calm and normal to Wray.  (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶¶ 156-67.)

Heimsness now contends that as he prepared and fired, he saw no one else around or behind the suspect, including O'Malley and Officer Troumbly.  After Heenan was shot and fell to the ground, Heimsness acknowledges seeing Troumbly standing at the scene in a position that would have been behind Heenan -- and therefore in Heimsness's line of sight -- during the physical altercation, but claims he was suffering from tunnel vision at the time he shot Heenan.  Plaintiff contends that this is an issue of credibility that only a jury can decide.

15

According to William Newhouse of the Wisconsin State Crime Lab, the muzzle of Heimsness's firearm and Heenan's coat were approximately 24 to 42 inches apart when Heenan was shot. Adjusting for the length of Heimsness's arm and the gun, Heenan was approximately 4.5 to 6.5 feet from Heimsness at the time he was shot, which is consistent with O'Malley's estimation of 4 to 6 feet. (Pl.'s PFOFs (dkt. #72) ¶ 140.)

Dr. Vincent Tranchida, the Dane County Chief Medical Examiner, conducted Heenan's autopsy. Dr. Tranchida identified three gunshot paths: (1) going through the upper right arm, past the armpit, and into the rib cage; (2) going through the upper chest and exiting out the back; and (3) going through the back of the left hand and then into his torso. (Pl.'s PFOFs (dkt. #72) ¶ 170 (citing Deposition of Vincent Tranchida, M.D. ("Tranchida Depo.") (dkt. #58) 17, 26, 30-31).) Relying on Dr. Tranchida's description of the gunshot wounds, plaintiff posits that (1) Heenan was shot from a distance of greater than three feet, and (2) Heenan's back may have been up against a wooden pole. (*Id.* at ¶¶ 171-75 (citing Tranchida Depo. (dkt. #58) 19, 22-24, 26-27, 39-31, 79-80).)

### G. MPD's Investigation of Shooting[16]

At approximately 3:00 a.m. on November 9, 2012, the night shift officer in charge contacted Lieutenant Dan Olivas, the Professional Standard & Internal Affair ("PISA") Lieutenant for MPD.  In that role, Olivas completed the internal investigation and administrative review of the facts surrounding the shooting to determine if Heimsness's actions complied with MPD policies and training.

Olivas began his review that morning.  In response to an MPD request that the Dane County Sheriff's Office provide an observer, Lieutenant Tim Schuetz of the sheriff's office also monitored the investigation.  Olivas's review and investigation spanned several weeks.  Olivas interviewed everyone involved in any way with the shooting, reviewed voluminous reports, and met with an MPD use of force expert.

As part of his investigation, Olivas considered two use of force decisions: (1) Heimsness's decision to confront Heenan at gunpoint; and (2) his decision to deploy deadly force.  Olivas analyzed the first use of force decision in light of MPD Policy 4-500 Police Weaponry and concluded that Heimsness's actions complied with the policy.  Olivas analyzed the second decision in light of MPD Police 6-100 The Use of Deadly Force.  Olivas concluded that Heimsness's actions also complied with this policy.

---

[16] The court recounts MPD's investigation for context, although it is not clear how this is material to plaintiff's claims against Heimsness or the City.  In its amended complaint, plaintiff contends that the City is liable for "ratifying" Heimsness's use of force by finding it reasonable.  (Am. Compl. (dkt. #20) ¶¶ 511-12.)  This theory of liability is confusing for several reasons, the most significant is the lack of any causal connection between Heenan's shooting and the subsequent investigation of it.  To the extent that the investigation of Heenan's use of force is indicative of MPD's practice of handling excessive force claims, then it may be relevant, but not as a stand-alone theory of liability.

Olivas's findings were captured in a 38-page administrative review report to Chief Wray, dated January 1, 2013.  (Olivas Decl., Ex. E (dkt. #51-5).)

Chief Wray had final authority to determine whether Heimsness's use of force complied with policy and training.  After reviewing the investigative materials, Wray agreed with Olivas that Heimsness's actions were consistent with the two policies identified above.[17]  Specifically, Wray testified at his deposition that he believed it was reasonable for Heimsness to use deadly force (1) to protect O'Malley, (2) to protect himself because Heenan was reaching for Heimsness's gun, and (3) to a lesser degree, to prevent the escape of a person who Heimsness had reasonable cause to believe had committed a burglary in progress and who was not complying with the officer.  By letter dated January 9, 2013, Wray released to the public MPD's administrative report and the DOJ report referenced below.  (Olivas Decl., Ex. G (dkt. #51-7).)

MPD also requested an independent review of the shooting by the State of Wisconsin Department of Justice Training and Standards Bureau.  MPD provided the DOJ with information, including that compiled as part of the criminal investigation into the shooting by the Dane County District Attorney.  The DOJ issued its own written administrative review report dated January 8, 2013, concluding that Heimsness's use of deadly force fell within the training approved by the Wisconsin Law Enforcement Standards Bureau.  (Olivas Decl., Ex. F (dkt. #51-6).)  In a press release dated December

---

[17] Plaintiff does not dispute that Wray reached this conclusion, but contends that Wray's decision to exonerate Heimsness happened immediately, pointing inexplicably to his November 12th description of the case as a "deadly force" case, which it obviously was, whether consistent with policy or not.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 94.)

27, 2012, Dane County District Attorney Ismael R. Ozanne announced his determination that there was no potential criminal liability for Officer Heimsness, explaining the factual findings from the investigation that his officer had directed. (Olivas Decl., Ex. H (dkt. #51-8).)[18]

In challenging the significance of the investigation, plaintiff points out that in every investigation involving deadly use of force, MPD has found the officer's conduct reasonable. (Pl.'s PFOFs (dkt. #72) ¶ 337.) Plaintiff also criticizes MPD's failure to release Heimsness's MDC messages until after the various investigations concluded. Plaintiff further takes issue with the Department's consideration of information from the Dane County Medical Examiner to assess Heimsness's credibility in describing Heenan's position. (*Id.* at ¶¶ 343-353.)

Plaintiff is also critical of MPD's investigation of Heenan as compared to what it characterizes as a *lack* of investigation of Heimsness. Specifically, MPD requested preservation of Heenan's social media accounts and subsequently reviewed them, reviewed Heenan's recent purchases and credit card history, interviewed members of his family, friends, coworkers and acquaintances as to how he had been acting in the recent past and his propensity toward violence, tested him for drug and alcohol consumption,

---

[18] Plaintiff contends that the D.A. lacked certain information, including the MDC message that was sent two hours before the shooting and cited above. (*See supra* Facts § B.)

19

searched his room and car, and reviewed his text messages and call history.  In contrast, MPD took none of those same steps for Officer Heimsness.[19]

Plaintiff also points out that MPD searched for Heenan's criminal records -- of which there were none -- as well as searched for any municipal violations.   Wray explained at his deposition that this search provided information regarding what Heenan's demeanor might have been at the time he was shot.  In contrast, Wray had not reviewed Heimsness's disciplinary records concerning prior use of force, although he was aware of a past violation that had been sustained.  (Deposition of Noble Wray ("Wray Depo.") (dkt. #39) 66.)  *See infra* Opinion § IV.B.II.b.

In particular, Wray was not aware that in the context of the 2001 investigation (described below), MPD had credited witness statements that Heimsness moved and had ample time to exercise an alternative over Heimsness's contention that he "froze" and saw no alternative.  Wray was also unaware at the time he exonerated Heimsness that the City had determined in 2001 that Heimsness:  (1) employed poor judgment and tactical decision-making as he moved relative to the actions of the vehicle; (2) was found to not have a full comprehension of the MPD Use of Force policy; and (3) violated policy with respect to the shots fired in the 2001 incident.

Chief Wray finally testified that while he believed a lesser degree of force would have been sufficient to subdue Heenan, he nonetheless concluded that Heimsness reasonably believed a lesser degree of force would have been insufficient.  Wray knew

---

[19] The International Association of Chiefs of Police standard is to test officers for the presence of drugs and/or alcohol immediately following a critical incident.

that Heimsness created distance by pushing Heenan with his left non-dominant hand, but still believed that it was reasonable to shoot Heenan.  Wray also took into account Heimsness's claim that he was suffering from tunnel vision and auditory exclusion in finding his use of force reasonable.  Finally, while Heimsness was exonerated for the Heenan shooting, he was not permitted to return to active duty.

OPINION

## I.  Excessive Force Claim

The parties agree that plaintiff's excessive force claim is governed by the Fourth Amendment's "objective reasonableness standard" defined by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  *See* 490 U.S. at 395 (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard").  Still, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quotation marks omitted)).  This balancing is "not capable of precise definition or mechanical application."  *Graham*, 390 U.S. at 396.  Instead, the Supreme Court instructs that the analysis must focus on the "totality of circumstances" surrounding the incident.  *Id.* (citing *Garner*, 371 U.S. at 8-9); *see also Sallenger v. Oakes*, 473 F.3d 731, 739

21

(7th Cir. 2007).  In particular, the fact finder should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 390 U.S. at 396.

Critically, all of the facts and circumstances surrounding the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  The reasonableness determination must also "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  The failure to use an alternative, non-deadly force is not dispositive, although whether such an alternative existed is a factual question that *may* weigh on a trier of facts' ultimate determination of objective reasonableness.  *Deering v. Reich*, 183 F.3d 645, 650-51 (7th Cir. 1999) (discussing *Brower v. Cnty. of Inyo*, 884 F.2d 1316 (9th Cir. 1989)).

Generally speaking, "when an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force."  *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (*en banc*); *see also Garner*, 471 U.S. at 11-12 (defining reasonable use of deadly force in context of fleeing suspect).[20]    Accordingly, the

---

[20] The distinction between felony or misdemeanor is less material here, since Heimsness is not contending that he shot Heenan because he was attempting to flee the scene.  *See Garner*, 471 U.S. at 11 ("[I]f . . . there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape.").

defendants' summary judgment motion turns on whether plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to the objective reasonableness of Heimsness's belief that Heenan posed an imminent danger of death or serious bodily injury to himself or others at the time he fired his weapon.  For the reasons that follow, the court finds that it has.

As an initial matter, many of the key proposed finding of facts on which defendants rely in moving for summary judgment are legitimately in dispute.   For example, the City's brief lists 21 "undisputed" facts to establish that no reasonable jury could find Heimsness's use of force was objectively unreasonable.   Without going through each one, the court notes that several of the most material facts are in dispute on this record:

- The nature of the physical exchange and separation between O'Malley and Heenan.  (City's Opening Br. (dkt. #46) 22 at ¶ 6.)

- How Heenan approached Heimsness.  (*Id.* at ¶ 12.)

- Whether Heimsness repeatedly shouted orders to Heenan.  (*Id.* at ¶ 13.)

- The nature of the physical exchange and separation between Heenan and Heimsness.  (*Id.* at ¶¶ 13, 14.)

- Whether Heimsness's push created sufficient separation to remove any imminent threat posed by Heenan.  (*Id.* at ¶ 20.)

In addition to casting disputed facts in a light most favorable to defendants, rather than to Heenan as the non-movant, defendants fail to acknowledge other alleged facts that must be accounted for under a "totality of the circumstances analysis":

- Whether O'Malley was yelling "He's my neighbor"; Heimsness's apparent failure to acknowledge or react to that information; and whether an objective officer

would have reasonably reacted similarly given O'Malley's purported tone and the claimed urgency with which he was attempting to convey its significance.

- Whether Heimsness was aware that backup (Officer Troumbly) was on the scene, and whether and how that knowledge should have altered an objective officer's actions. *See Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) ("[T]he plaintiff's proffered expert testimony that Brook's tactics violated standard police practices, while not dispositive, may also be deemed relevant to the reasonableness inquiry.").[21]

- Whether Heenan was obviously, heavily intoxicated; whether Heimsness was or should have been aware of that fact; and if so, whether and how that should have affected his actions. *Cf. Sallenger*, 473 F.3d at 739 ("[M]ental illness may be relevant to the reasonableness inquiry.") (citing *Abdullahi*, 423 F.3d at 772).[22]

- Whether Heimsness was retreating or advancing toward Heenan.

- The nature of the forensic evidence to establish Heenan's position vis-à-vis a wooden pole when he was shot. *See, e.g.*, *Abdullahi*, 423 F.3d at 772 ("[M]edical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases.").

More fundamentally, defendants' argument on summary judgment is flawed by their general failure to consider and analyze the events under the totality of the circumstances. Instead, defendants press the court to consider narrowly the specific moment when Officer Heimsness chose to pull the trigger, shooting Heenan, a view soundly rejected by the Seventh Circuit. In *Deering*, 183 F.3d at 649, the court was critical of the district court's jury "instructions and . . . evidence rulings['] rather

---

[21] Of course, the jury's question for purposes of determining Heimsness's liability is not whether he violated policy – MPD, police or other standard policies -- but rather whether his use of force was objectively reasonable under the totality of the circumstances.

[22] Even if resolved in plaintiff's favor, this fact, like many others, could cut both ways. A jury could reasonably believe a heavily intoxicated person is more unpredictable and, therefore, dangerous, meaning that an objective officer might reasonably view such a person as more of a threat.

restrictive view of what constitutes the totality of the circumstances." The court went on to explain that

> what Deputy Reich knew at the time — about Deering, his crime, and the warrant, and his perception of the danger he and the other deputies were in — was relevant to the evaluation of the reasonableness of his conduct. In addition, the balancing required by *Garner* requires a look at the countervailing governmental interest in serving the warrant on Deering, which would include the time and manner in which it was served. Finally, of course, all of the events that occurred around the time of the shooting are relevant. In other words, the totality of the circumstances is what must be evaluated. When a case is tried to a jury, the evaluation of those circumstances must be left to that jury.

*Deering*, 183 F.3d at 652.

Here, the "totality of the circumstances" surrounding the shooting include the fact that (1) Heimsness had backup as he approached the scene; (2) Heimsness was wearing a baton and had access to pepper spray; (3) on his command, Heimsness *had* achieved substantial separation between the suspect and the victim/homeowner; and (4) the suspect appeared to be unarmed.[23]   While the relevant inquiry is limited to what *Heimsness* knew at the time, plaintiff is also free to challenge the veracity of Heimsness's account of what he knew, including by use of O'Malley's testimony that Heenan was

---

[23] Even if Heimsness's use of deadly force may have been reasonable at some point during his encounter with Heenan, it does not mean it remained reasonable, at least where circumstances have substantially changed. *See Sallenger*, 473 F.3d at 740 ("Although closed-fist blows and blows with the flashlight may have been necessary at first, this does not mean that this force was still justified after the handcuffs had been secured."). While the court recognizes that the time between Heimsness's apparently light push or shove of Heenan and Heimsness's subsequent shooting of Heenan was but a second or two, a reasonable jury may find under all the circumstances that a four to six foot separation between Heenan and Heimsness removed any objective, imminent threat to Heimsness's or others' safety, and therefore Heimsness's rapid decision to shoot Heenan was not objectively reasonable.

visibly intoxicated and that he repeatedly told Heimsness that Heenan was actually his neighbor.  *See Sherrod*, 856 F.2d at 806 ("The veracity of Officer Berry's testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand.").[24]

The Seventh Circuit's statement in *Marion v. City of Corydon, Ind.*, 559 F.3d. 700 (7th Cir. 2009), that "[p]re-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment," does not conflict with *Deering* or *Sherrod*.  While Heimsness's civil liability may not be based on his decision to take out his gun *or* to approach the scene without back-up clearly in place, nor will plaintiff be allowed to argue liability based on those decisions, his pre-seizure actions and decisions *are* part of the totality of circumstances that the jury may consider in determining the ultimate issue: whether his ultimate decision to use deadly force was objectively reasonable.

In support of his motion, Heimsness directs the court to a number of other cases, none of which are sufficiently close on the facts to support the grant of summary judgment here.  For example, Heimsness cites to *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007), in which the Seventh Circuit affirmed the district court's grant of summary judgment to defendant officers, finding that the officers' use of deadly force was reasonable.  Like the case at issue here, the shooting of an unarmed suspect occurred

---

[24] Defendants argue that the fact Heenan may have been a neighbor is meaningless, since this alone would tell an objective officer nothing about him being a threat, but again this ignores how and why O'Malley might have been trying to urgently convey this fact, something the trier of fact may or may not find would be reasonably important to an objective police officer.

during a scuffle with officers.  Unlike here, however, that plaintiff (also an estate of the decedent) "offer[ed] no real evidence" to contradict "the officer's characterization of the events," making it undisputed that:  Henning was actively resisting arrest; that the officers "tried hand strikes, pepper spray, and baton blows to the torso and legs to get him subdued"; one officer's gun fell to the ground and was positioned under Henning's body with Henning's hand possibly on the gun; and Henning yelled "shoot me, you're going to have to shoot me."  *Id.* at 494-95, 496.  In contrast, the plaintiff here has come forward with: (1) substantial contradictory testimony from a third-party witness, O'Malley, corroborated in part by the testimony of Troublby, Heimsness's fellow officer; and (2) forensic evidence concerning bullet exit wounds, as well as other evidence calling into question the accuracy of Heimsness's account.  All of this evidence raises genuine issues of material fact surrounding Heimsness's ultimate use of lethal force.  *See also Marion*, 559 F.3d at 701 (affirming grant of summary judgment to defendants officers where plaintiff "offered no counter-affidavit and pointed to no evidence that would call into question defendants' submissions").

Curiously, Heimsness also relies on the Seventh Circuit's *en banc* decision in *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988), which reversed and remanded a jury's verdict in favor of an estate *not* for entry of summary judgment, but for *a new trial*. Importantly, the court did not -- as Heimsness suggests -- find that "the officer's shooting was justified."  (Heimsness's Opening Br. (dkt. #55) 6.)  Instead, the Seventh Circuit held that the district court erred in allowing testimony and other evidence establishing that the suspect was found to be unarmed because the defendant officer did not claim

otherwise.  "Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment."  *Sherrod*, 856 F.2d at 805.  Importantly, the court also concluded that "[t]he veracity of Officer Berry's testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand."  *Id.* at 806.

Equally curious, Heimsness points to another Seventh Circuit decision in *Ellis v. Wynalda*, 999 F.2d 243 (7th Cir. 1993), which actually *reversed* a grant of summary judgment on qualified immunity grounds, finding that:  (1) the plaintiff had raised issues of material fact touching on the question of qualified immunity; and (2) even accepting the police officer's account of events, "a jury could conclude that the immediate danger had passed by the time [the officer] fired."  *Id.* at 247.  Heimsness nonetheless argues that this case supports his motion for summary judgment because of *dicta* in the opinion describing certain circumstances that were *not* at issue in that case and that may have provided a basis for affirming the district court's grant of summary judgment.  *Id.* at 247.  Even if the court were to treat this language as providing general guidance on an officer's reasonable use of deadly force, fact issues still remain as to Heenan's actions and whether they posed an objectively reasonable threat to the safety of Heimsness and others.[25]

---

[25]  Similarly, Heimsness cites to *dicta* in *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), that police officers "may use deadly force to protect themselves, even after choosing a risky course of action to stop a fleeing felon."  *Id.* at 233.  Not only is this case distinguishable from the facts at issue in *Enyart* -- there is no contention that Heenan was

The court's denial of defendants' motions for summary judgment should hardly be surprising.  "[S]ince the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Abdullahi*, 423 F.3d at 773 (citation and internal quotation marks omitted); *see also Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) ("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify . . . .  [A] court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statement and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.").  Here, a jury is required to resolve a number of discrete, factual disputes, as well as the ultimate difficult question of whether Heimsness's use of deadly force was objectively reasonable.

While a determination of Heimsness's civil liability under the Fourth Amendment must, therefore, proceed to trial, the court would be remiss not to address briefly plaintiff's repeated attempts to usher in evidence of supposed bad faith in its claim against Heimsness.  As described above, the test is an "objective one," meaning that the determination is made "without regard to [an officer's] underlying intent or motivation."  *Graham*, 490 U.S. at 397.  "[E]vil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good

---

fleeing -- but more importantly, that court also found factual disputes which precluded the officers from asserting qualified immunity in advance of trial.

intentions make an objectively unreasonable use of force constitutional." *Id.* As this statement from *Graham* makes plain, this framework cuts both ways: while a plaintiff may not introduce evidence of bad faith to somehow bolster a jury's finding of objective unreasonableness, neither need a plaintiff show deliberate indifference as in the Eighth Amendment context to demonstrate liability under the Fourth Amendment. "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Id.* at 399 n.12. The exact line between admissible evidence and inadmissible evidence will be addressed by this court as part of the parties' motions *in limine* before trial, with reference to the specific pieces of evidence either side seeks to introduce, but *both* sides should understand their obligation to hew that line.

## II. Qualified Immunity

Having found that factual issues preclude defendant's motion for summary judgment on the merits of plaintiff's excessive force claim, the court must further address whether those same factual issues preclude a grant of qualified immunity before trial. The test for qualified immunity is a familiar one. To determine whether defendant Heimsness is entitled to qualified immunity, the court must consider: (1) whether the facts as shown make out a violation of a constitutional right; and (2) if so, whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "A plaintiff can show that a right is 'clearly established' by statute or constitution in at

30

least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 508-09 (7th Cir. 2015) (quoting *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001)).

Defendant Heimsness's claim to qualified immunity is also based on facts and inferences made in *his* favor.  Essentially, Heimsness argues that it was not clearly established he could not use deadly force "when he responded to a burglary and home invasion in progress and observed: (1) the suspect physically struggling with the homeowner; (2) the suspect disobey repeated lawful commands; (3) the suspect turn on him and swat at him and at his service weapon; and (4) the suspect continue to physically attack him while he tried to retreat and protect his gun away from Mr. Heenan's advances."  (Heimsness's Opening Br. (dkt. #55) 16.)  As explained above, among other factual disputes that may impact the jury's determination of whether the force used was objectively reasonable, plaintiff has raised genuine issues of material fact with respect to the proper characterization of the actual physical exchange between O'Malley and Heenan; whether Heimsness issued repeated orders to Heenan; whether Heenan was swatting or attempting to swat at his gun; whether Heenan was advancing and how he was advancing toward Heimsness; and whether Heimsness was retreating or moving toward Heenan.

Where factual disputes exist, a defendant must adopt *plaintiff's* version of the facts in asserting his right to be free from the excessive force inflicted on him was not

sufficiently clear at the time of the shooting.  *See Sallenger*, 473 F.3d at 742 (reversing grant of qualified immunity because "[v]iewing the facts in the light most favorable to the plaintiff," the right to be free from excessive force was clearly established); *Estate of Starks v. Enyart*, 5 F.3d 230, 235 (7th Cir. 1993) (dismissing officer defendant's appeal of denial of qualified immunity because the appeal rested on factual disputes for which the court lacked jurisdiction to consider).  Adopting *plaintiff's* version of the facts as the jury would have to do to find Heimsness liable at the time of the shooting, it has been clearly and long established that shooting an individual in the chest three times who did not pose an imminent threat to the safety of the officer or others violates that individual's Fourth Amendment right to be free from excessive force.

Accordingly, while it is an arguably higher standard of proof for plaintiff and, therefore, a closer question, the court denies Heimsness's motion for summary judgment on qualified immunity grounds for the same reason the motion is denied on the merits -- factual disputes preclude a finding under the first prong that plaintiff has not made out a constitutional violation, and those same factual disputes similarly preclude a determination of whether the particular constitutional right at stake was clearly established at the time of the shooting.  *See Weinmann v. McClone*, No. 14-1794, slip op. at *2, *4 (7th Cir. May 27, 2015) (affirming district court's denial of qualified immunity in excessive force claim because of factual disputes).  Certainly, where the facts are sufficiently clear, it is preferable to grant qualified immunity at summary judgment to spare a state actor the added disruption and expense of trial, and this court is willing to revisit the question of qualified immunity after trial, but in a case this heavily fact

intensive, and more importantly heavily laden with material factual disputes, Heimsness's entitlement to qualified immunity must await trial. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1010-14 (7th Cir. 2013) (denying interlocutory appeal where claim to qualified immunity depend upon disputed facts).

### III. Motion to Bifurcate Liability Phase of Trial

Before turning to the City's separate motion for summary judgment on plaintiff's claim asserted against it, the court first takes up defendants' joint motion to bifurcate the liability phase of trial since that motion frames the court's treatment of the City's motion for summary judgment. Defendants propose that the excessive force claim against Heimsness be tried first, separate from the *Monell* claim asserted against the City, arguing that both judicial economy and avoiding unfair prejudice to Heimsness justifies the request. Adding to defendants' assertion of judicial economy, the City agrees to stipulate to entry of judgment against it *if* Heimsness is found liable, attaching a signed "stipulation and waiver of requirement of proof" to its motion. (*See* Joint Mot. to Bifurcate, Ex. A (dkt. #91-1).)

Federal Rule of Evidence 42(b) provides in pertinent part that:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.

The court agrees with defendants that bifurcation is warranted both to avoid prejudice to Heimsness and for judicial economy, especially in light of the City's stipulation.

*First*, introducing evidence of Heimsness's disciplinary history and the recent MDC messages -- both of which would be pertinent to plaintiff's *Monell* claim against the City for deliberate indifference to the need for supervision -- in the same phase of the trial in which the jury considers whether Heimsness's use of force was objectively reasonable may well unfairly prejudice Heimsness. *See, e.g.*, *Fuery v. City of Chi.*, No. 07 C 5428, 2015 WL 715281, at *3 (N.D. Ill. 2015) (finding bifurcation warranted where evidence relevant to the *Monell* claim would unfairly prejudice the individual defendants); *Awalt v. Marketti*, No. 11 C 6142, 2014 WL 6908470, at *3 (N.D. Ill. Dec. 8, 2014) (granting motion to bifurcate Eighth Amendment deliberate indifference claims directed against individual defendants from those asserted against the county to avoid prejudice to individual defendants).

There are cases in which the evidence relevant to a personal liability claim sufficiently overlaps with that of the municipal liability claim that the efficiencies of a single phased liability trial would overcome the possible prejudice to an individual defendant -- *e.g.*, deliberate indifference to serious medical need based on a treatment protocol set by a county jail -- but this is not such a case. Even with a strongly-worded curative instruction that the standard Heimsness must meet is an objective one, the risk is too great that the jury would be unable to ignore the subjective aspects of Heimsness's specific, prior instances of use of force, as well as MDC messages, which arguably reflect a dark humor that sometimes accompanies a very difficult occupation *or* a disturbingly flippant attitude about shooting someone.[26]

---

[26] Of course, this is not to prejudge the possible introduction of some of this same

34

Plaintiff does not directly address the likely prejudice to Heimsness, but rather argues that defendants have not met their burden of demonstrating that bifurcation is warranted in light of the fact that "the plaintiff has the right to tell his story with such descriptive richness as he sees fit." (Pl.'s Opp'n (dkt. #99) 3.) While plaintiff may be the master of its complaint, the court is obligated under Rule 42(b) to steer the course of the trial, and the Federal Rules of Evidence require the exclusion of marginally relevant evidence that has a substantial risk of unduly prejudicing a party. Given the very different standards of liability the jury must apply in deciding Heimsness's and the City's respective liability, which directly impacts the relevance of much of the charged evidence here, the court is compelled to manage its introduction. Even assuming it is defendants' burden to demonstrate that bifurcation is warranted, therefore, defendants have met that burden.

*Second*, the court also agrees with defendants that bifurcation is warranted in light of judicial economy. While there are circumstances where the jury could find the individual defendant not liable, but the municipality could still be on the hook for a constitutional violation -- most notably instances where qualified immunity applies[27] -- this is not one of those cases. *See generally* 1A Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 7.13[C] (4th ed. 2015); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (explaining that the jury could have found that the

---

evidence to impeach, or should defendants open the door, which is the subject of pending motions *in limine*.

[27] *See Owen v. City of Independence*, 445 U.S. 622, 639 (1980) (holding that a City is not entitled to qualified immunity).

medical technician defendants were not deliberately indifferent to the detainee's medical needs, but still find the County liable "because of the well-documented breakdown in the County's policies for retrieving medical request forms").[28]   Here, if the jury finds Heimsness not liable, then there will be no need to try a *Monell* claim against the City.  In other words, plaintiff's claim against the City is entirely dependent on the success of its claim that Heimsness used excessive force in violation of the Fourth Amendment.[29]

As for qualified immunity, the court has denied that relief before trial and, at this stage, while Heimsness may renew his motion before the jury returns a verdict on the claim against him, the court would likely again deny that motion given the need for the jury to resolve material factual disputes for the reasons already explained at length above. To clarify, the jury necessarily will reach the question of whether Heenan's rights were violated.  Regardless, the court can foresee no circumstance in which *Monell* liability will need to be tried at all in light of the City's stipulation.   As such, judicial economy

---

[28] Importantly, *Thomas* involved an Eighth Amendment claim which requires a subjective showing of deliberate indifference.  Here, the claim asserted against Heimsness solely turns on an objective determination.  *See Thomas*, 604 F.3d at 305 (explaining that "to determine whether the County's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth").

[29] Plaintiff contends that the violation of Heenan's rights can be attributed to a single employee, Heimsness.  Absent a showing that he violated Heenan's rights by using excessive force, there is no claim against the City.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1988), (verdict in favor of the defendant officer on an excessive force claim requires dismissal of the claim against the city); *see also Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994) ("[T]he jury verdict in favor of Officer Boggs on the question of whether he used excessive force precludes the possibility that Thompson could prevail on his *Monell* claim.") (citing *Heller*).

36

warrants excluding potentially prejudicial evidence relevant mainly, if not exclusively, to that issue.

*Third* and finally, plaintiff argues that the City's stipulation would defeat important "societal benefits" derived from a jury's determination of the City's liability. Indeed, plaintiff points out, since the City is required to indemnify Heimsness for any damages here, "the City's offer to stipulate adds nothing to the equation -- a judgment against Heimsness already effectively operates as a judgment against the City." (Pl.'s Opp'n (dkt. #99) 5.) The court certainly appreciates plaintiff's argument, but absent a relevant factual question for the jury to decide on plaintiff's *Monell* liability claim, there is no reason this evidence need be placed before a jury.

Of course, a claim for injunctive relief against a municipality under § 1983 might still be ripe. *Swanigan v. City of Chi.*, 775 F.3d 953, 961 (7th Cir. 2015) ("Municipalities 'can be sued directly under § 1983 for monetary, declaratory, or injunctive relief.'" (quoting *Monell*, 436 U.S. at 690)). The court, therefore, would be open to entertaining requests for an equitable remedy as the evidence may dictate (*e.g.*, requiring different training, methods for supervising officers, etc.). Any disputed facts pertinent to a claim for equitable relief could be heard by the court outside of the jury's presence, while the jury is deliberating on plaintiff's claim against Heimsness.

Accordingly, the court will accept the City's stipulation of entry of judgment against it should the jury find in favor of plaintiff on its claim against Heimsness, as well as grant defendants' motion to bifurcate. Because of this, the court need only consider

whether plaintiff has identified a genuine issue of fact as to any one of its multitude of *Monell* liability theories.

## IV.  *Monell* Liability

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).  Rather, there must be a "link between a municipal policy or custom and the alleged constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *see also Thomas*, 604 F.3d at 306 (requiring a showing of a "causal link" between the municipal policy and the constitutional violation).  Generally speaking, there are four bases for finding municipal liability: (1) a formal policy; (2) a well-settled custom or practice; (3) a final decision of a municipal policymaker; or (4) deliberate indifference for training or supervision.  1A Martin A. Schwartz, *Section 1983 Litigation: Claims & Defenses* § 7.06[A] (4th ed. 2015).  As far as the court can discern, plaintiff attempts to argue for liability on all four bases, but the court will focus on the two for which plaintiff responded with meaningful evidence on summary judgment.

### A.  Formal Policy

#### i.    MPD's Structure

The Madison Police Department has about 525 employees, including 450 commissioned officers, and an annual budget in 2013 of approximately $60 million. From 2004 through the time of the shooting, Nobel Wray was its chief of police.  As chief, Wray was the person with the ultimate responsibility for assigning, training,

supervising and disciplining Madison police officers.  The chief of police is also an official

policy maker for the City of Madison with regard to the City's police force.

### ii.   City's Use of Force Policies

Madison Police Department Policy 6-100 provides in pertinent part:

> The use of deadly force is only authorized when under any of the following circumstances, an officer reasonably believes a lesser degree of force would be insufficient:
>
> 1. in the defense of another person when the officer has reasonable cause to believe is in imminent danger of death or great bodily harm;
>
> 2. in defense of oneself, when there is reasonable cause to believe one is in imminent danger of death or great bodily harm;
>
> 3. to effect the arrest or prevent the escape of a suspect who the officer has reasonable cause to believe has committed, or attempted to commit, a felony involving the use or threatened use of deadly force, when a high probability exists that the suspect, if not immediately apprehended, may cause death or great bodily harm;
>
> . . .

(Declaration of Dan Olivas ("Olivas Decl."), Ex. D (dkt. #51-4) p.2.)

The MPD also has a specific policy on "drawing the handgun and confronting

suspects," which is part of MPD Policy 4-500 and provides in pertinent part:

> 1. A handgun may be removed from its holster in the performance of duty under the following circumstances and only with the finger outside of the trigger guard:
>
> a. When an officer reasonably believes that the potential for the authorized use of deadly force may exist.
>
> b. When it is necessary to secure in a safe place or check on the serviceability of the weapon.

39

c. At an approved range.

2. Confronting Suspects with Drawn Handgun

a. The finger will remain outside of the trigger guard until such time as circumstances exist which reasonably indicate a danger to life or of great bodily harm.

b. If applicable to the officer's particular weapon system, the pistol will be in double action mode, and the weapon will not be cocked.

c. If applicable to the officer's particular weapon system, after being fired, a semiautomatic pistol may remain in the cocked/single action mode until such time as the immediate threat of death or great bodily harm has been neutralized. The weapon will then be restored to double action mode by use of the decocking lever.

(Olvas Decl., Ex. C (dkt. #51-3).)

In addition to this formal, written policy, plaintiff contends that the force authorized or encouraged during its MPD's training of police officers is equivalent to a "working policy" on use of force.  (Pl.'s PFOFs (dkt. #72) ¶ 193.)  The evidence at least indicates that MPD *expects* that an officer will use deadly force consistent with the way the department has trained the officer.   Accordingly, plaintiff cites heavily to a PowerPoint presentation, "Winning Mindset: Peak Performance During and After Critical Incidents," which purports to be a training document for MPD recruits.  (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 197 (citing Farrell Decl., Ex. Z (dkt. #64-26)).) Among other things, the presentation provides that it is "acceptable to take a life and feel good," describes common characteristics of officers who are killed in the line of duty, and sets up a picture of most citizens as sheep, compared to aggressive sociopaths as wolves and police officers as sheepdogs.  (Farrell Decl., Ex. Z (dkt. #64-26).)   Among other

concerns, plaintiff's expert contends that this presentation is "unnecessarily aggressive and dangerous," creating an "'us and them' mentality." (Pl.'s PFOFs (dkt. #72) ¶ 210 (citing Expert Report of William T. Gaut ("Gaut Rept.") (dkt. #59) 31-33).)

### iii.   Analysis

There appears no credible argument that MPD's use of force policy, Policy 6-100, is constitutionally suspect. Indeed, the Policy's articulated bases for use of deadly force is entirely consistent with the standard articulated in *Graham*, *Garner*, and other Supreme Court and Seventh Circuit cases defining the use of deadly force. Still, plaintiff essentially argues that the PowerPoint presentation used in training constitutes a "working policy," and that the information in the presentation condones the use of deadly force beyond the scope of the limits of the Fourth Amendment.

Even assuming for purposes of argument that portions of this presentation are inconsistent with the Fourth Amendment, this is not a "policy statement, ordinance, regulation or decision official adopted and promulgated" by the City. *Monell*, 436 U.S. at 690. Plaintiff further failed to offer evidence that this single PowerPoint training presentation was so well-established or widespread as to constitute a custom or practice. *See Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (describing a custom or practice under *Monell* as one "which, although unwritten, is so entrenched and well-known as to carry the force of policy" (internal citation omitted)). Moreover, plaintiff failed to come forward with any evidence that Chief Wray or another person with policymaking authority was aware of the presentation, much less adopted it, again even assuming it deflects from the official deadly use policy. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501,

511 (7th Cir. 1993) ("'[A] practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability' if the plaintiff can establish that the policymaking authority acquiesced in a pattern of unconstitutional conduct.").

Plaintiff also focuses its attention on Wray's role in reviewing Olvas' report investigating Heimsness's use of deadly force, and Wray's conclusion that Heimsness's use of force was reasonable.   As described above (*see supra* n.16), however, Wray's *subsequent* finding that Heimsness's use of force was reasonable -- even adopting plaintiff's view that Wray somehow "ratified" Heimsness's use of force -- cannot satisfy the causation prong of a *Monell* claim.   Instead, plaintiff's claim is best framed as one premised on the City's alleged deliberate indifference to the training and supervision needs of its officers, to which the court now turns.

### B.  Deliberate Indifference to Need for Training and Supervision

####   i.   Training

#####     a.  Heimsness's Hiring and Training Generally

At the time of the shooting, Heimsness had been an officer with the City of Madison Police Department for approximately 15 years.   Before acceptance to the MPD Academy, all candidates who advance to a certain point in the application process participate in a pre-employment interactive personality assessment with a psychiatrist. Heimsness completed this assessment.   Heimsness then attended the Madison Police Academy, where he received training in the proper use of force, among other things. Plaintiff disputes whether that training was successful in ensuring that Heimsness understood the proper use of force, specifically pointing to his inability as part of a 2001

investigation to define "imminent" and the MPD's finding as part of that investigation that Heimsness's use of force was in violation of the reasonableness standard set forth in the use of deadly force policy.  (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶ 114.)

In addition to and as part of the Madison Police Academy, Heimsness received over 900 hours of training through the MPD's Pre-Service Academy, which is certified by the Wisconsin Department of Justice and covered care and use of firearms, defensive and arrest tactics, and crisis management, among other topics.  After graduating from the Academy, Heimsness also participated in the MPD's field training and evaluation program from February through May 1998, where he was paired with an experienced field training officer and provided mentoring and feedback.  Heimsness successfully completed this program as well.  As of September 1, 1998, the Wisconsin Law Enforcement Standards Board ("LESB") also certified Heimsness as being qualified to be a law enforcement officer in Wisconsin.  Since that certification, Heimsness has received periodic firearms qualification testing, as well as additional training through formal in-service programs, including on defensive and arrest tactics, among other topics.

### b.  MPD's Training regarding Tunnel Vision and Auditory Exclusion

MPD's training curriculum, both in the Pre-Service Academy and as part of ongoing in-service instruction, includes regular teaching about physiological responses to stress known as "tunnel vision" and "auditory exclusion."  As set forth in the Defense and Arrest Tactics and Firearms student manuals provided by the LESB and used by MPD, "tunnel vision" is defined as:

> a narrow arc of vision an individual experiences under stress. The lens of the eye flattens to give sharper vision but this cuts down on peripheral vision. (Peripheral vision is a wide arc of vision that allows a person to see objects to the right and left of center.)

(Declaration of Thomas Snyder ("Snyder Decl."), Ex. D (dkt. #48-4).) "Auditory exclusion" is defined as "a kind of stress-induced deafness that may occur as part of the flight or flight response to danger." (*Id.*) The manual further provides that to avoid tunnel vision, "you have to consciously look around during a confrontation to avoid visually 'locking in' on one adversary and missing others that may present a threat." (*Id.*)

The parties dispute the extent to which MPD has successfully adopted this suggestion, and others concerning the management of stress in critical situations and incorporated them into training. (Pl.'s Resp. to City's PFOFs (dkt. #71) ¶¶ 137-41; City's Resp. to Pl.'s PFOFs (dkt. #81) ¶¶ 320-21, 325.) The parties agree that both perception changes can occur in stressful deadly force encounters, but also dispute whether this is a common or typical reaction. (*Id.* at ¶ 300-01.) Still, it is undisputed that MPD is aware of and has an expectation that it will address officers who experience tunnel vision, auditory exclusion and freezing.

### c.   MPD's Efforts to Mitigate against Unreasonable Fears of Officers

Former Chief Wray testified at his deposition that it is critical that police supervisors be vigilant in monitoring the symptoms of "unreasonable fear,"[30] so that they can provide assistance to officers before a serious incident develops. Wray also testified

---

[30] Plaintiff does not define "unreasonable fear," but it appears to include debilitating auditory exclusion or tunnel vision. (*See* Pl.'s PFOFs (dkt. #72) ¶¶ 308-09.)

that if it were brought to the department's attention that an officer was experiencing debilitating auditory exclusion or tunnel vision, MPD would attempt to help an officer mitigate those perceptions.  Even so, Wray acknowledged that MPD does not require officers to report these symptoms, nor is he aware of any indicators that tend to show that an officer experiences, or is at risk of experiencing, unreasonable fear.

In Officer Troumbly's case, for example, she acknowledged experiencing auditory exclusion while on duty even before the Heenan shooting, but had not reported this symptom because there was no requirement to do so.  Troumbly also testified to her belief that she suffered from both tunnel vision and auditory exclusion during the Heenan shooting, although MPD never assessed Troumbly's symptoms or otherwise addressed them.

With respect to Heimsness specifically, plaintiffs point to a reference by the MPD's training sergeant in the 2001 investigation of the parking ramp shooting, which "showed a concern with the reasonableness of Heimsness' perception."  (Pl.'s PFOFs (dkt. #72) ¶ 329 (citing Olivas Decl., Ex. K (dkt. #51-11) p.19).)  The parties dispute whether Heimsness received training on tunnel vision and auditory exclusion as a part of the 2001 remedial training.  (*See* City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 330.)  It is undisputed, however, that Chief Wray was not aware of the MPD's finding that Heimsness's claims of tunnel vision or freezing were mitigating factors to his use of unreasonable force in 2001.

As early as 1994, the City established Administrative Procedure Memorandum No. 2-15 -- Critical Incident Debriefings, later named Critical Incident Stress

45

Management ("CISM"), for all City employees who experience a critical incident event as defined by the policy.  This protocol is contained in Policy 5-200 of the MPD manual.  A critical incident is defined as "a situation experienced by a person that may cause them to experience unusually strong emotional reactions [and] that have the potential to interfere with the ability to function during the incident, immediately following the incident or later."  (City's PFOFs (dkt. #45) ¶ 295.)   This process consists of defusing and debriefing, although what occurs, as well as when the process occurs, is determined on a case by case basis.  Defusing, however, generally takes place with those immediately involved in the incident and provides an opportunity for emotional decompression and information exchange.  Debriefing is done with a larger group, and its purpose is to provide psychological closure and reconstruction.

    ii.    **Supervision**

        a.  **MPD's Investigation of Complaints against Officers**

At all times relevant to this case, MPD had extensive procedures in place by which complaints against its employees are investigated.   Consistent with those policies, a disciplinary complaint filed against an MPD officer is resolved by the investigating supervisor in one of the following five ways:

1. Exonerated -- The alleged incident occurred, but was lawful and in accordance with policy.

2. Unfounded -- The evidence shows that the allegation was false.

3. Not sustained -- The allegation is not supported by preponderance of evidence.

4. Sustained -- A preponderance of evidence shows that the action of the employee was not consistent with Department policy.

46

5. No Finding -- Circumstances dictate a disposition of no finding.  These can include: a complaint received outside of the 90-day time limit; a complainant wishing to withdraw the complaint; a complainant no longer available or not cooperating with the investigation; a complaint received on a retired employee, or on a person not employed by MPD; or a minor complaint informally resolved to the satisfaction of the complainant.

(Olvas Decl., Ex. A (dkt. #51-1).)

Chief Wray testified at his deposition that the investigation of all public complaints received by MPD regarding the use of force by an officer is an important means of serving the public.  Investigation of civilian complaints also deters officer misconduct.  If officers are aware that most complaints of the people they arrest will never be investigated, the deterrent effect is diminished.  Whether to document a report by formally recording it is left to the discretion of the person receiving the complaint. Only formally documented complaints are investigated.

MPD's policies do not allow for the imposition of discipline unless there is a sustained finding that the officer violated MPD policy.  Moreover, between at least 2004 and 2012, it was MPD's policy to hold a civilian complaint in abeyance if made by someone who was criminally charged, at least until the complainant's criminal case had been resolved.  (Olivas Decl., Ex. A (dkt. #51-1) p.5.)

### b.  Heimsness's Disciplinary Record

There were eight excessive force complaints against Officers Heimsness before the shooting of Paul Heenan.  Four of the complaints concerned a shooting in a city parking ramp in 2001.  As described below in more detail, that complaint was "sustained," meaning that the investigation concluded that Heimsness was in violation of MPD

policy.  The other complaints were all received after the 2001 shooting, and only one of these -- a 2006 State Street Brats incident, which was not sustained -- was investigated to completion.  The remaining three complaints resulted in a "no finding" disposition for reasons described above.  For those complaints, plaintiff maintains that there is no way for a supervisor to know whether the officer used excessive force as alleged by the civilian submitting the complaint.  Absent a finding of excessive force, the officer cannot be disciplined and will remain in his or her position of authority.

While plaintiff's comparative data is neither complete nor entirely comparable, plaintiff asserts that Heimsness had significantly more excessive force complaints made against him than the average police officer.  As a point of comparison to Heimsness's eight complaints over some twelve years before Heenan's shooting in 2012, plaintiff points out that across the approximately 450 total commissioned officers in the MPD in 2012, there were only seven excessive force complaints in *total*.  Plaintiff primarily focuses on the following two examples in support of its claim that the City failed to supervise Heimsness.

<u>2001 Lake Street Parking Ramp Incident</u>

On June 27, 2001, at approximately 11:14 p.m., Heimsness was on bicycle patrol with Officer Gouran in the Lake Street parking ramp.  After hearing a car playing very loud music and driving fast, the officers approached to at least give the driver a warning, as well as check for possible controlled substances or alcohol.  The vehicle contained four men and one woman, all between the ages of 16 and 21.  When Heimsness attempted to talk to the 18-year-old driver at his side window, the driver ignored him.  Heimsness then

48

drew his gun and advised dispatch that he had a vehicle in the Lake Street ramp at gunpoint.  Seconds later, Heimsness advised that shots had been fired at the front tires, as the car attempted to leave the Lake Street ramp.

According to the MPD report dated June 28, 2001, the 18-year-old driver claimed that he was "backing up and all of a sudden this officer pointed a gun at him through the windshield."[31]  (Compl. (dkt. #1) ¶ 4105; Answ. (dkt. #21) ¶ 19 (admitted).)  The driver also stated that he was confused and scared because the officer said, "I'll blow your fucking brains out."  (*Id.*)  Not knowing what to do, he continued to back up, at which point shots were fired and the driver stated that he panicked because he "thought he was going to be shot."  (*Id.*)  The other occupants of the car and a parking lot security officer similarly stated -- as also described in the MPD report -- that the officer told the driver that he was going to shoot him in the face or something to that effect.

During the investigation, Officer Heimsness was asked about his understanding of the MPD's deadly force policy, particularly of the meaning of imminent threat.  The report indicates that "Heimsness struggled with a definition of imminent...he ended saying he did not know."  (Am. Compl. (dkt. #20) ¶ 4013; Answ. (dkt. #22) ¶ 4013 (admitted).)  Heimsness acknowledged as part of the investigation that he was not in

---

[31] The City objects to statements in the report on hearsay grounds.  (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 401).   The report itself appears to be a record of a regularly conducted activity pursuant to Federal Rule of Evidence 803(6).  As for the driver's and other witness's statements in the report, none constitute hearsay because, as best as the court can tell, plaintiff is not offering them (and the court is certainly not considering them) for the truth of the matter asserted, but rather to establish what the City had been told and, as set forth below, actually concluded with respect to Officer Heimsness's past use of deadly force.

imminent danger when he fired the second shot, but with respect to the first shot, Heimsness stated "that he saw no options because he froze and could not move."  (Am. Compl. (dkt. #20) ¶ 4015; Answ. (dkt. #22) ¶ 4015 (admitted).)  Heimsness also stated that he "began getting tunnel vision."  (Am. Compl. (dkt. #20) ¶ 4016; Answ. (dkt. #22) ¶ 4016 (admitted).)

According to the investigation report, two security guards reported that Heimsness purposely put himself in front of the vehicle and had enough time to move to a different position.   (Am. Compl. (dkt. #20) ¶¶ 4020-22); Answ. (dkt. #22) ¶¶ 4020-22 (admitted).)   As part of this investigation, the City credited witness statements over Heimsness's version of the events, and noted that Sergeant Snyder, who was trained in the use of deadly force, expressed a "concern with the reasonableness of Heimsness's perception."  (Pl.'s PFOFs (dkt. #72) ¶ 20 (citing Olvas Decl., Ex. K (dkt. #51-11) p.19).)[32]

The MPD report concludes:

> Based on the totality of the circumstances in the case[,] it appears that Heimsness employed poor judgment and tactical decision making as he moves relative to the actions of the vehicle.  Because of this[,] he places himself in a position that he eventually believes poses an imminent threat.  Further examination of the facts show that that [Heimsness's] reasoning is flawed and does not meet the standard of what a reasonable officer would believe, since he is able to move back through the eventual path that the vehicle would travel allowing the vehicle to pass his position.  [Heimsness] states

---

[32] For his part, at the time of the investigation of the incident, Heimsness wrote to the MPD stating that he "developed the physiological effect of tunnel vision."  (Pl.'s PFOFs (dkt. #72) ¶ 421.)  Heimsness also reiterated that he suffered from tunnel vision and froze at his deposition in 2005.

> he shoots the tire to stop the vehicle but later acknowledges
> that through his experience one flat tire will not stop a
> vehicle.

(Olvas Decl., Ex. K (dkt. #51-11) p.26.)

Officer Heimsness was suspended for 15 days without pay -- five days were served and ten days were held in abeyance. Heimsness was also removed from participation in the Special Events Team for a minimum of one year. Heimsness also was required to complete eight hours of remedial training regarding tactics, policy, and deadly force decision making, which culminated in a Firearms Training Simulator session and live fire drills. In 2005, as part of a deposition in the civil action brought by the teenagers involved in the Lake Street Parking incident, Heimsness testified that he would have been justified in shooting and killing the teenaged driver because he was in imminent danger, and the enforcement folks "got it wrong." (Pl.'s PFOFs (dkt. #72) ¶¶ 426, 431.) After this testimony, the civil matter settled. No personnel action was taken against Heimsness, nor was he required to receive further training on the use of force policy, other than standard training provided all officers.

<u>2006 State Street Brats Incident</u>

In December 2006, a bartender at State Street Brats called 911 reporting that the police: "almost killed this guy and I don't think he deserved this. They were kicking him in the head and stomping on his face and bending his neck over the side and he's out now and there's blood everywhere[.]" (Pl.'s PFOFs (dkt. #72) ¶ 442.)[33] The day after

---

[33] The recording of the 911 call and other documents central to the investigation may be admissible as a record of a regularly conducted activity under Fed. R. Evid. 803(6), but

this call, the bartender filed an excessive force complaint against Heimsness about use of force.  As part of the investigation, Heimsness admitted that he kicked the man five or six times and delivered four or five knee strikes, but was not aiming for his head and did not know where the blows landed because the man's head was covered with his coat. Heimsness's partner reported that he did not see Heimsness delivering any knee strikes, kicks or punches.

As part of the investigation, however, another State Street Brats employee stated that he witnessed one police officer on the man's "back attempting to restrain the man and had his right arm as the man was lying face down," while a second officer repeatedly "kicked the man extremely hard with the tip of his shoe to the top of the man's head." (*Id.* at ¶ 447.)  That same witness said the second officer also took "full swings, punching the man in the back of his head three to five times," and that he finally kneed him in the back of his head two to three times before finally grabbing the man's left arm and pulling it to the right arm so that the other officer could place handcuffs on him.  (*Id.*)  Finally, another State Street Brats employee similarly described Heimsness intentionally stomping on the man's head.  (*Id.* at ¶ 448.)

Despite all five civilian witnesses denying the arrestee's head was covered, the MPD ultimately did not sustain the excessive force complaint because both Heimsness and his partner reported that the head was covered, and therefore the kicks or knee strikes to the head may have been inadvertent.

---

even if not, it appears plaintiff is proposing this fact not to prove the truth of the matter asserted, but rather in support of its claim that the City was aware of Heimsness's prior uses of force.

### c.  Heimsness's Mobile Data Computer Messages

Plaintiff also submits a significant number of Heimsness's MDC text messages in the months leading up to Heenan's shooting.  Chief Wray acknowledged at his deposition that the content and frequency of these messages indicated that Heimsness: (1) had a lack of respect for his supervisors; (2) either had the inability or lacked the desire to follow MPD's rules; and (3) was having emotional and anger problems.  Some of these messages appear below.

- September 7 and 8, 2012 (two months before the shooting): "I should have blasted that guy with the knife through my window the other day.  At least I would have got the weekend off," and "I could have wrote that up real good." (Pl.'s PFOFs (dkt. #72) ¶ 16 (citing Farrell Decl., Ex. O (dkt. #64-15) p.4).) By "blasted," Heimsness testified at his deposition, he meant "shot," and by "wrote that up," he meant "justifying" the shooting in a written report.

- September 9, 2012: "i'm ready to go on a shooting spree up in dispatch," and "I better go in. it's getting light out and all these people will soon be able to see the raging contempt on my face."  (Pl.'s PFOFs (dkt. #72) ¶ 224.)

- September 9, 2012: "given that I'm about to launch into a jihad against dispatch, that probably isn't wise."  (*Id.* at ¶ 225 (citing Farrell Decl., Ex. O (dkt. #64-15) p.5).)

- September 18, 2012: "i left school[,] worked for 10 years, went back to college, go[t] this job, and my income doubled...and I got benefits...and a gun...so that's cool."  (Pl.'s PFOFs (dkt. #72) ¶ 230 (citing Farrell Decl., Ex. O (dkt. #64-15) p.6).)

- October 4, 2012: "jesus, help me. . . . I don't think i can do this anymore." (Pl.'s PFOFs (dkt. #72) ¶ 234.)

- October 5, 2012: "jesus, i'm glad I took tomorrow off. . . . I'm going to kill somebody.  Dispatch, coworkers who ever."  (*Id.* at ¶ 235.)

- October 5, 2012: "i can't handle this anymore."  (*Id.*)

- October 20, 2012: "i love walking in and being the mean one."  (*Id.* at ¶ 236.)

- November 1, 2012, Heimsness had the following MDC exchange with another officer while on duty:

  > Other officer: "we thought we would follow you around all night...good training in policy 'adherence'"

  > Heimsness: "oh no, i'm no longer doing that"; "catch me if you can, pfc [Police and Fire Commission]"

(Pl.'s PFOFs (dkt. #72) ¶ 25 (citing Farrell Decl., Ex. O (dkt. #64-15) p.9).)

The parties dispute whether there are adequate rules in place to require an officer to report another officer's comments about shooting someone. Specifically, the City contends that it has policies in place requiring the reporting of "significant violations." (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 248.) At the same time, the City acknowledges that it has a policy warning officers not to speak critically of each other. Indeed, if the supervisor did not sustain the complaint about a coworker's performance of duties, the underlying complaint could be considered abusive or frivolous *and* serve as a basis to punish the complaining officer. Except for one supervising officer, none of the officers who received Heimsness's inappropriate messages were disciplined for failing to report them.[34]

### d. MPD's Lack of an Early Warning System

An early warning system is a data-based police management tool that is designed to identify officers whose behavior is problematic, allowing supervisors to be proactive in intervening, rather than waiting for an incident to occur. Plaintiff's expert contends that such a system is "an essential component of any well managed law enforcement agency."

---

[34] Heimsness was ultimately terminated because of violations of departmental conduct rules, mostly involving his MDC messages.

(Pl.'s PFOFs (dkt. #72) ¶ 281 (citing Gaut Rept. (dkt. #59) 26).)   MPD has set no threshold number of complaints within any certain time period that would trigger increased supervision of a police officer.   The City disputes the value of this tool, on the basis that "relying on the number of complaints . . ., without more evidence regarding the significance of the complaints or conclusive evidence of wrongdoing is violative of the officer's due process rights."   (City's Resp. to Pl.'s PFOFs (dkt. #81) ¶ 288 (citing *Savage v. Dane Cnty.*, 588 F. Supp. 1129, 1133 (W.D. Wis. 1984)).)[35]

From 1998 to 2011, whether a complaint about an officer warranted enhanced supervision of that officer was a decision made on a case-by-case basis by the officer's supervisor.   If a supervisor noticed a trend in the frequency of complaints, the officer in question would typically be required to discuss the complaints with his supervisor. When annual shift changes occurred, supervisors would generally exchange "information" with an officer's new supervisors, although plaintiff contends that no such district supervisor records were in Heimsness's personnel files.   Beginning in 2008, MPD started implementing a formal computerized and automated early warning system, but that system was not fully functioning until the spring of 2013, some months after Heimsness shot Heenan.

---

[35] In *Savage*, this court noted -- arguably in dicta -- that *firing* an officer solely based on the number of complaints against him would violate the officer's due process rights. *Savage*, 588 F. Supp. at 1133.   Of course, this does not address the value of a system based on the quantity *and* quality (*i.e.* apparent merit) of such complaints.

### iii.   Analysis

In light of this evidence, plaintiff contends it has met its burden on summary judgment to show the City's deliberate indifference under *Monell* in at least two respects: (1) the lack of meaningful, needed training of officers on auditory exclusion, tunnel vision and efforts to mitigate unreasonable fears; and (2) the failure to investigate adequately civilian complaints and establish an early warning system for troubled officers. In *City of Canton,* the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  489 U.S. at 388.  The Seventh Circuit has recognized a deliberate indifference claim premised on a lack of supervision as well.  *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) ("This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers.").

As the Seventh Circuit explained, "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission [] is likely to result in constitutional violations."  *Cornfield v. Consol. High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).  This "notice" requirement may arise in either of two circumstances.

> First, a municipality acts with deliberate indifference when, "in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy *so likely to result in the violation of constitutional rights*," that the deficiency exhibits deliberate indifference on the part of municipal policymakers.

> Alternatively, we may find deliberate indifference when a *repeated pattern* of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers."

*Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *Canton*, 489 U.S. at 390 & n.10) (internal citations omitted; emphasis added).[36]  Stated another way, if the City "is faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction."  *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (internal citation and quotation marks omitted).

Here, plaintiff has not put forth sufficient evidence from which a reasonable jury could find that the City, through former Chief Wray as a policymaker, acted with deliberate indifference to actual or constructive knowledge of a specific need for additional training on auditory exclusion and tunnel vision, or methods to mitigate unreasonable fear for all officers in general, although plaintiff has shown that such training may well be beneficial.  The record reflects that MPD both is aware of the threat posed by tunnel vision and auditory exclusion and has incorporated training on these issues into its curriculum.  Indeed, while plaintiff contends that the remedial training was inadequate, there is no dispute that the City ordered training, including training on tunnel vision and auditory exclusion, following the sustained finding against Heimsness in 2001.  On this record, no reasonable fact finder could conclude that the City has

---

[36] Importantly, the deliberate indifference standard under § 1983 for municipal liability claims does *not* require subjective proof as is required in the Eighth Amendment context.  *See Farmer v. Brennan*, 511 U.S. 825, 840-41 (1994) (contrasting the standard in *Canton* with that adopted in the Eighth Amendment context).

adopted a "policy of inaction" with respect to training needs identified by plaintiff.  *See King*, 680 F.3d at 1021.

The evidence plaintiff has proffered on summary judgment does, however, permit a finding by a reasonable trier of fact that the City acted with deliberate indifference in failing to conduct meaningful investigations of civilian complaints of excessive force generally, and to ensure that supervisors were aware of repeated complaints against a single officer like Heimsness by means of an early warning system or other mechanism for monitoring trends in civilian complaints.  More specifically, plaintiff has put forth sufficient evidence of a "pattern or series of incidents" -- at least with respect to Officer Heimsness -- to render obvious the need for additional supervision.  *See Jenkins*, 487 F.3d at 492; *Cornfield*, 991 F.2d at 1326.  As in *Sornberger*, 434 F.3d at 1029-30, plaintiff has at least put forth sufficient evidence to "create a triable issue of fact" as to whether the City failed to respond adequately "to repeated complaints of constitutional violations by its officers," whether by failing to investigate complaints or to monitor the frequency and type through an early warning system or other mechanism.

Plaintiff has also put forth sufficient evidence from which a reasonable jury *could* conclude that there was a "causal link" between the City's deliberate indifference to supervision of its officers and the violation of Heenan's constitutional rights.  *Thomas*, 604 F.3d at 306.  Specifically, a reasonable jury *could* find that if the City had adequately supervised officers like Heimsness, especially with respect to addressing callousness and lack of insight about an officer's decisions concerning repeated uses of deadly force, Heenan may not have been shot.  Of course, a jury could also find this claim too fraught

with speculation and hindsight to hold the City liable on this claim, but that is why we have trials in this country.

ORDER

IT IS ORDERED that:

1) Defendant City of Madison's motion for summary judgment (dkt. #44) and defendant Steven Heimsness's motion for summary judgment (dkt. #49) are DENIED;

2) Defendants' joint motion to bifurcate (dkt. #91) is GRANTED; and

3) Defendant City of Madison's stipulation and waiver of requirement of proof (dkt. #91-1) is ACCEPTED.

Entered this 1st day of June, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge